UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
David Marasco,                                          :
                                                        :
                Plaintiff,                        :    **MEMORANDUM AND ORDER**
                                                        :
                -against-                        :    02-CV-6257 (DLI)(CLP)
                                                        :
Bridgestone/Firestone, Inc., Bridgestone                :
Firestone, Inc. Long Term Disability Plan,              :
and Plan Administrator for the Bridgestone              :
Firestone, Inc. Long Term Disability Plan,              :
                                                        :
                Defendants.                       :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

      Before the court are the parties' cross-motions for summary judgment involving a dispute over plaintiff's coverage under a disability benefits plan that was terminated by plaintiff's employer, defendant Bridgestone/Firestone, Inc. ("Firestone"). Plaintiff brings this action under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. For the reasons set forth below, the court denies defendants' motion for summary judgment and grants plaintiff's motion for summary judgment. The court grants plaintiff's request for attorney's fees and costs and remands this case to defendants for reconsideration of plaintiff's claim for disability benefits.

**I.    Facts**[1]

      Plaintiff David Marasco was hired by defendant Bridgestone/Firestone, Inc. ("Firestone") on

---

[1] As plaintiff failed to submit a Statement of Material Facts as required by Local Civil Rule 56.1, the facts in defendants' Statement of Material Facts are deemed admitted.

1

November 10, 1986 as a Service Manager in the company's Brooklyn store location. Plaintiff was automatically enrolled in Firestone's Long Term Disability Benefits Plan for Salaried Employees (the "Plan"). The Plan vests Firestone's Pension Department, which is composed of the Disability Committee and Pension Board, with the authority to manage the Plan and make determinations as to coverage.

On December 7, 1998, plaintiff was admitted to the hospital for one week and diagnosed with deep venous thrombosis of the left leg, bilateral varicose veins, edema, and cellulitis. Plaintiff applied for disability benefits under the Plan and received benefits for an initial twenty-six weeks, the "Elimination Period," which ended on June 30, 1999. After the first twenty-six weeks, the Plan provides that the employee can apply for long term disability benefits for an additional two years. For this two-year period, called the "Initial Duration" of "Total Disability," the employee must show, among other requirements,[2] that he or she is (1) "completely unable to perform any and every duty pertaining to his [or her] occupation with the Company" because of "sickness (including mental or emotional disease or disorder) or accidental bodily injury," and (2) "under the regular care of a physician licensed to practice medicine (M.D. or D.O.) or a surgeon licensed to practice medicine and perform surgery." (Fugitt Aff. Ex. A § II.B.) Plaintiff's application for Initial Duration benefits was approved on July 15, 1999 and granted for a two-year period expiring on June 30, 2001.

---

[2] The employee must also show that he or she is "receiving Social Security Disability Benefits," "not engaged in any gainful occupation," and "not confined in a penal institution or other house of correction." (Fugitt Aff. Ex. A § II.B.) Additionally, the employee must show that the condition for which he or she seeks benefits under the Plan was not caused by self-inflicted injury, war, alcoholism, drugs, or participation in a felony or first degree misdemeanor. (*Id.*) None of these requirements is challenged by defendants.

To qualify for long term disability benefits after the Initial Duration, the requirements remain the same except for showing disqualification from certain work: the employee must show that he or she is "unable to perform the essential duties of *any occupation* for which the Covered Employee is reasonably suited by reason of education, training or experience." (Fugitt Aff. Ex. A § II.B (emphasis added).) On January 5, 2001, Sandie Fugitt, a disability analyst with Firestone's Pension Administration department, sent plaintiff a letter advising him that the Initial Duration benefits period was to expire and that he should send "all medical records from all treating physicians regarding all disabling conditions" in order to be considered for continued disability benefits. (*Id*. Ex. B. at 137.) On or about July 9, 2001, the Disability Committee met and denied plaintiff's claim for additional disability benefits beyond the Elimination Period and two-year Initial Duration. By letter dated July 12, 2001 from Ms. Fugitt, Firestone informed plaintiff that his disability benefits were denied "pursuant to Section II.B(b) of the Long Term Disability Plan. Under the provisions of the Long Term Disability Plan, you must be unable to perform the essential duties of any occupation for which you are reasonably suited by education, training or experience . . . ." (*Id*. at 181.) Also contained in the letter were instructions for pursuing an appeal. Plaintiff hired a lawyer to assist him in the appeal, which, after several requests for extensions, was filed on September 14, 2001. The Pension Board considered plaintiff's appeal in October 2001 and, by letter dated October 19, 2001, advised plaintiff that his appeal was denied, explaining that the Board had determined plaintiff was "physically capable of sedentary work." (*Id*. at 203.)

***Summary of Medical Evidence Presented in Plaintiff's Application for Disability Benefits Beyond the Initial Duration***

Plaintiff's application for disability benefits contained the following records:

- Report dated December 7, 1998, describing lower extremity vascular imaging performed by Dr. Harvey Stone and noting that plaintiff had acute right superficial femoral vein deep vein thrombosis and chronic left superficial femoral vein deep vein thrombosis. (Fugitt Aff. Ex. B at 141.)

- Discharge report from plaintiff's week-long hospital stay between December 7 and 14, 1998. Plaintiff was diagnosed with deep venous thrombosis, bilateral varicose veins, edema, and cellulitis. Plaintiff was instructed to take Coumadin (a blood thinner), elevate his legs, wear special stockings to aid blood flow to the legs, and start a weight loss program. (*Id*. at 144–45.)

- Report dated December 28, 1998 from Dr. Michael Kassouf, a general and vascular surgeon, noting that plaintiff has "Chronic Venous Insufficiency, associated with large varicosities and varicose veins, with advanced stasis dermatitis and pigmentation." Plaintiff was instructed to continue taking Coumadin and have weekly PT (prothrombin time) / PTT (partial thromboplastin time) tests for 12 to 24 months. (*Id*. at 143.)

- Report dated March 12, 1999 from Dr. Mitchell Tannenbaum, who diagnosed plaintiff with osteoarthritis and noted that there was no evidence of fracture or dislocation. (*Id*. at 142.)

- Certificate of Disability dated January 23, 2001 from Dr. Bhupendra Shah, plaintiff's physician, noting plaintiff's severe varicose veins, osteoarthritis of the knees, and phlebitic edema. Dr. Shah described plaintiff's disability as "severe and total complete" and likely to

4

increase in the next six to twelve months. Dr. Shah reported that plaintiff had permanent restrictions on standing and sitting, was in need of keeping his legs elevated, and was incapable of sedentary or light duty work. (*Id*. at 139.)

- Report dated January 24, 2001 from Dr. Thomas Larkin, noting plaintiff's history of osteoarthritis in the right knee and that plaintiff could actively flex and extend his right knee up to ninety degrees. Dr. Larkin prescribed daily doses of Celebrex since plaintiff was not taking an anticoagulant. (*Id*. at 140.)

- Report dated April 20, 2001 from Dr. Elias Sedlin, an independent medical examiner hired by Firestone. Dr. Sedlin noted that plaintiff had surgery for varicose veins in 1988 and 1991 and that he developed deep vein thrombosis in 1996 and 1998. Dr. Sedlin reported plaintiff's history of being hospitalized and prescribed Coumadin and special leg stockings. Dr. Sedlin diagnosed plaintiff with osteoarthritis of the knees, morbid obesity, and chronic venous statis. Regarding plaintiff's limitations, Dr. Sedlin opined: "The patient is incapable of working at the job he form[er]ly held as he describes it. He could conceivably work at a sit down job which would not require him to get up and down frequently. I would consider him permanently and totally disabled, as I understand from his education attainments and his physical limitations." (*Id*. at 151–52.)

When Ms. Fugitt forwarded the above records to Dr. Kenneth Bulen, an advisor to the Disability Committee retained by Firestone to review plaintiff's file, Dr. Bulen requested on April 30, 2001 that an employability assessment be conducted for plaintiff. A company called Re-Employment Services prepared a list of ten jobs for which plaintiff might qualify. Dr. Sedlin found seven of the ten jobs appropriate for plaintiff, involving duties such as a telephone operator,

5

dispatcher, or customer service representative, whereas Dr. Shah found none of the jobs appropriate. Based on the employability assessment and responses given Drs. Sedlin and Shah, Dr. Bulen then opined that "Mr. Marasco does not appear eligible for continued long term disability." (Fugitt Aff. Ex. B at 178.) These details, as well as the records above, were considered by the Disability Committee when it denied plaintiff's request for disability benefits beyond the Initial Duration.

On appeal to the Pension Board, plaintiff submitted an additional letter, dated September 4, 2001, from Dr. Shah, who indicated that he had been treating plaintiff since 1988. Dr. Shah stated that, in his opinion,

> Mr. Marasco is unable to maintain full or part-time gainful employment on a regular or sustained basis due to the severity of the condition of his legs, and edema of the legs, which is exacerbated by cardiomegaly [an enlarged heart].
>
> He cannot stand for any length of time or do any lifting of heavy objects. He cannot sit for any period of time in excess of one half hour because the constant sitting will put pressure on his varicose veins and increase the swelling in his legs, which in turn increases his risk for phlebitis and clotting. The cardiomegaly contributes to the swelling of his legs.
>
> The constant edema, varicose veins and arthritis are a constant source of great pain to Mr. Marasco. He must periodically elevate his legs for more than 30 minutes at a time throughout the day.

(*Id*. at 193–94.)

## II. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the

nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). In drawing inferences in favor of the nonmoving party, "the court is not entitled to weigh the evidence." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000). Nevertheless, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### III. ERISA Standards

Where, as here, a benefits plan grants "a plan administrator the discretionary authority to determine eligibility," the court should "not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *See, e.g.*, *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995). Plaintiff argues that the court should instead apply a *de novo* review standard because the Plan administrators, also employees of Firestone, were operating under a conflict of interest. Although "[s]uch a conflict may be 'inherent' to some extent when a plan is both administered and insured by a single entity," *Fay v. Oxford Health Plan*, 287 F.3d 96, 109 (2d Cir. 2002), the court should not diverge from the "arbitrary and capricious" standard unless the plaintiff shows that "the administrator was *in fact* influenced by the conflict of interest." *See, e.g.*, *Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (quoting *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1256 (2d Cir. 1996) (emphasis added)). Here, plaintiff has pointed out that the Plan is both administered and evaluated by Firestone. Plaintiff also contends that bias is shown by the fact that

7

the three members of the Disability Committee (Ms. Fugitt, Dr. Bulen, and Frank Racco), who made the initial determination not to extend benefits, were members of the Pension Appeals Board, though only one of these members, Mr. Racco, was a voting member. These allegations, however, do not provide any evidence of actual conflict, so "arbitrary and capricious" standard applies. *See id.*; *cf. DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 66 (2d Cir. 1997) ("blatant conflict" shown by testimony that Appeals Committee had no set procedures and regularly "destroy[ed] or discard[ed] all records within minutes after hearing an appeal").

When applying the "arbitrary and capricious" standard, the court should reverse a denial of benefits "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pulvers*, 210 F.3d at 92 (quoting *Pagan*, 52 F.3d at 442). For evidence to be "substantial," it must be "such . . . that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)). Where the parties present the court with two reasonable, competing interpretations, the court must give deference to the plan administrator's interpretation. *See Pulvers*, 210 F.3d at 92–93.

Under ERISA, a plan administrator must provide an employee whose claim for benefits has been denied with a "full and fair review." 29 U.S.C. § 1133(2). Failure to conduct a "full and fair review" can be grounds for finding that a plan administrator's decision was "arbitrary and capricious." *See Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998). A plan administrator must also "provide adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." *Id*. § 1133(1). The plan

administrator must "inform the participant of what evidence [was] relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence." *Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus.*, No. 00 Civ. 2013, 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004) (quoting *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am.*, 715 F.2d 853, 858 (3d Cir. 1983)). On appeal, a full and fair review necessitates considering "all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503–1(h)(2)(iv).[3] Evidence of conflict of interest is "a factor to be weighed 'in determining whether there has been an abuse of discretion.'" *Pulvers*, 210 F.3d at 92 (quoting *Sullivan*, 82 F.3d at 1255); *see also DeFelice*, 112 F.3d at 66 n.3 ("[I]f the administrative interpretation is reasonable, then the conflict is of little, if any, consequence. Yet *Firestone* [*Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989),] instructs that a conflict is a "factor" in determining whether there has been an abuse of discretion.").

Some circuit courts have held that "substantial compliance" with ERISA regulations is sufficient, but the Second Circuit has not spoken on the issue at this time. *See Nichols v. Prudential Ins. Co.*, 406 F.3d 98, 107 (2d Cir. 2005) (declining to extend "substantial compliance" standard to strict deadlines for claim review by plan administrators but acknowledging acceptance of this standard by other circuits in applying regulations that do not involve "block[ing] or delay[ing] a plaintiff's access to the federal courts"). As will be explained below, the court finds neither strict

---

[3] Plaintiff cites § 2560.503–1(h)(3)(ii), which, in a similar vein, requires "a review that does not afford deference to the initial adverse benefit determination," but this section is specific to group health plans.

nor substantial compliance.

**IV. Analysis**

The court is unsatisfied that the plaintiff was afforded a "full and fair review" for several reasons. Plaintiff was not given the "specific reasons" for the denial of his disability benefits in the July 12, 2001 letter reporting the Disability Committee's decision. That the letter cited "Section II.B(b)" of the Plan and mentioned that plaintiff had not shown inability to engage in "any occupation" was not a specific reason. *See, e.g.*, *Cejaj v. Bldg. Serv. 32B-J Health Fund*, No. 02 Civ. 6141, 2004 WL 414834, at *8 (S.D.N.Y. Mar. 5, 2004) (denial letter "devoid" of specific reasons where it "merely reiterate[d] that plaintiff did not meet the medical standard for permanent disability, defined as the inability to work in any capacity"). The denial letter plaintiff received did not clue him in as to what he could do to perfect his claim, which also violates ERISA regulations. *See, e.g.*, *Dawes v. First Unum Life Ins. Co.*, No. 91 Civ. 0103, 1992 WL 350778, at *1, 3 (S.D.N.Y. Nov. 13, 1992) (denial letter that "did not specify what information [plaintiff] could provide that would alter the insurer's determination that he was not disabled" not in compliance with ERISA regulations, which require the plan administrator "to state its specific reasons for denial, to describe the additional material or information necessary for plaintiff to perfect his claim, and to explain why such material or information was necessary"). Because Firestone did not provide specific reasons for the denial or ways for plaintiff to perfect his claim, there was no "meaningful dialogue between [the] ERISA plan administrator[] and [its] beneficiar[y]" as called for by ERISA. *See Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000) (quoting *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)). The October 19, 2001 letter denying plaintiff's

appeal quoted Section II(B) and added that the Pension Board found plaintiff "physically capable of sedentary work." But this weakness on which the Pension Board focused should have been communicated to plaintiff before the end of Firestone's consideration of his claim for disability benefits.

Plaintiff characterizes Firestone's use of Re-Employment Services as suspect and result-oriented, given that, before using this service, there was no information in the record that would support a denial of disability benefits. In attempting to prove bias, plaintiff submits an article written by Re-Employment Services founder Gordon Butler, "Getting the Tough Cases Back to Work," published in *Risk Management Magazine* in November 2002. While this article does mention workers who "intentionally sabotage interviews" when caught up in a workers' compensation legal battle, it also counsels employers to maintain a "strong return-to-work program [that] builds up the employee's confidence during his or her recovery." (Pl.'s Ex. 5.) Thus, the article focuses more on how employers can motivate employees who are able to return to work—not on how employers can fabricate results to deny employees disability benefits. *Cf. Barnes v. Bellsouth Corp.*, No. 03 Civ.A. 16, 2003 WL 22399567, at *11 (W.D.N.C. 2003) (conflict of interest shown where employability firm advertised providing employers with "[i]nformation that is *outcome-based* and specific to both [the employer's] needs and the individuality of the client").

Whether or not Re-Employment Services may have provided outcome-based services—and there is no showing that it did—the court is concerned by the manner in which the Disability Committee and Pension Board handled the survey results and comments received by Drs. Sedlin and Shah. In denying plaintiff's claim, Firestone did not explain how it reconciled Dr. Sedlin's checked-off boxes on seven jobs he believed plaintiff could perform with Dr. Sedlin's prior statement that

11

plaintiff was "permanently and totally disabled." Though Dr. Sedlin opined that plaintiff "could conceivably work at a sit down job which would not require him to get up and down frequently," this report directly contradicted Dr. Shah's assessment that plaintiff's main trouble was with sitting for long periods of time. Dr. Shah's September 4, 2001 letter stated that plaintiff "cannot stand for any length of time or do any lifting of heavy objects," must regularly elevate his legs, and cannot sit for more than half an hour at a time. [4] Yet Dr. Sedlin found plaintiff suited for jobs that would require him to sit for up to six hours during the day. The Supreme Court has rejected the use of a "treating physician rule"—as applied by the federal courts in reviewing an administrative law judge's decision regarding disability benefits under the Social Security Act—whereby the treating physician is accorded deference. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829–30, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). But the Court has also urged that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

Defendants also did not inquire into plaintiff's capacity for taking public transportation or otherwise traveling from his home in Brooklyn to locations such as Manhattan, Long Island City, Syosset, and Maspeth Queens (the locations of the jobs proposed by Re-Employment Services). Ms. Fugitt testified at her deposition that she did not know whether the Disability Committee had ever

---

[4] Plaintiff's wife testified at her deposition that her husband cannot sit for more than 30–40 minutes at a time, can stand for only 25 minutes at a time, and can walk around for about 15 minutes at a time. (E. Marasco Dep. at 75–76.) Mrs. Marasco testified that her husband must spend time in his recliner with his feet reclined, but he must get up at one-hour intervals or dangle his legs and feet. (*Id.* at 77.) Though this testimony was not available to defendants, and is thus not part of the record on consideration by this court in applying the "arbitrary and capricious" standard, it highlights the fact that defendants should have asked for further information given the discrepancies concerning plaintiff's ability to sit for long periods of time.

obtained information regarding plaintiff's use of public transportation. Though defendants argue that plaintiff should have provided more information about his cardiomegaly, which was brought up on appeal, the Pension Board should have requested information if necessary for a "full and fair review."

The court's concern that plaintiff did not receive a "full and fair review" is exacerbated by the fact that Dr. Bulen and Ms. Fugitt, who both voted to deny plaintiff's disability benefits, were involved in the appeal before the Pension Board. Though showing actual conflict of interest is required for a more deferential standard of view, evidence of conflict or bias can be factored in the court's decision as to whether a plan administrator's determination was arbitrary and capricious. *See, e.g.*, *Pulvers*, 210 F.3d at 92. From Ms. Fugitt's deposition testimony, it seems her and Dr. Bulen's involvement in the appeals process was considerable:

> Q: Can you describe what you recall being said at that meeting regarding Mr. Marasco's appeal of his long term disability benefits?
> A: . . . I did the introduction for cases at the [P]ension [B]oard meeting, introduced the case basically giving an overview of Mr. Marasco, his service with the company, his age and position, [and] a determination by the [D]isability [C]ommittee and Dr. Bulen reviewed his medicals and all additional information in the pension board file regarding information from Re-[E]mployment Services and any additional information obtained after the [D]isability [C]ommittee meeting.
> Q: Then after that occurred was there a vote?
> A: Yes.
> Q: Was the vote unanimous?
> A: Yes.
> Q: Do you know how long it took?
> A: I don't recall, no.
> Q: Do you recall any discussion other than what you have testified about?
> A: Generally to the medicals and the jobs and whether they felt he was capable of performing any of the positions, I don't remember specifics.

(Fugitt Dep. at 69–70.) Furthermore, Ms. Fugitt testified that this meeting was a video

13

teleconference between Pension Board members in Akron, Ohio and Nashville, Tennessee. Thus, the court is at least alerted to the possibility that Dr. Bulen and Ms. Fugitt—who undoubtedly wished the Pension Board to affirm their initial determination to deny benefits—had influence over members of the Appeals Board, particularly if they made summary presentations. There is no information as to whether all members of the Pension Board had copies of the records in front of them. Either way, this procedure occurred in violation of ERISA regulations requiring that appeals involve "all comments, documents, records, and other information submitted by the claimant relating to the claim, *without regard to whether such information was submitted or considered in the initial benefit determination*." 29 C.F.R. § 2560.503–1(h)(2)(iv) (emphasis added).

Defendants attempt to discredit Dr. Shah's opinions by pointing out that he is not a specialist in plaintiff's condition, that Dr. Shah is plaintiff's landlord, and that plaintiff's wife is an employee of Dr. Shah. None of these concerns, however, explains why the Disability Committee and Pension Board failed to provide plaintiff with a "full and fair review" as described above. Defendants' argument that plaintiff is not "under the regular care" or Dr. Shah is unconvincing, particularly since defendants apparently found this requirement met when they approved plaintiff for Initial Duration benefits.

For the reasons discussed above, defendants' motion for summary judgment is denied. Although each of the court's concerns, assessed individually, may not have risen to the level of "arbitrary and capricious," as a whole, they do. Plaintiff's motion for summary judgment is thus granted insofar as defendants failed to provide plaintiff with a "full and fair review."

## V. Remand

The court has raised significant doubts over the discrepancies between the assessments from Drs. Sedlin and Shah and the employability surveys indicating that plaintiff can supposedly sit for six hours per day. Nevertheless, because there are details in the record that should be further explored, the appropriate remedy is a remand for reconsideration. *See, e.g.*, *Miller*, 72 F.3d at 1071 (remand appropriate "unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality'").

Accordingly, this matter is remanded to the Pension Board for a full and fair review in accordance with the standards set forth in the court's decision. The Pension Board is not limited to the information currently in the administrative record and is directed to seek more information concerning plaintiff's capacity for sedentary work, ability to travel to and from work, and the effect of his cardiomegaly condition. Pension Board members should review all documents in the record anew and not rely on summaries from persons who participated in the Disability Committee's decision to deny benefits.

The court retains jurisdiction over this matter, which is stayed pending review from the Pension Board. The parties are directed to provide the court with a status report by May 17, 2006.

## VI. Attorney's Fees

Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g). The factors the court should weigh in determining whether to award attorney's fees are:

(1) the degree of the offending party's culpability or bad faith, (2) the ability of the

15

offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987).

One reason defendants set forth in arguing that plaintiff's request for attorney's fees should be denied is that the Pension Board conducted a "diligent review." As explained above, the court has found several ways in which the Pension Board did not comply with ERISA regulations. Defendants raise no concern over Firestone's ability to satisfy a potential award of attorney's fees. Though defendants argue that deterrence is not at issue, since determinations are made on a case-by-case basis, the deficiencies focused on by the court concern procedure. An award of attorney's fees would serve a purpose in encouraging Firestone to modify its procedures for the better. Better procedure would, in turn, affect review of all participants' claims for benefits under the Plan. Therefore, the court, in its discretion, grants plaintiff's request to award reasonable attorney's fees and costs.

## VII. Conclusion

As set forth above, defendants' motion for summary judgment is denied and plaintiff's motion for summary judgment is granted. The case is remanded to the Pension Board for reconsideration concordant with ERISA requirements, as discussed in the court's decision. Pending the outcome on remand, this action is stayed. The parties shall provide the court with a status report by May 17, 2006. Plaintiff's request for reasonable attorney's fees and costs is granted. Plaintiff shall submit an affidavit detailing the amount of fees and costs by March 8, 2006. Defendants may

respond by March 22, 2006. Plaintiff may submit a reply, if any, by March 29, 2006.


SO ORDERED.

DATED:	Brooklyn, New York
	February 15, 2006

_____/s/_____
DORA L. IRIZARRY
United States District Judge